**Joe E. PARSONS, Plaintiff,**

v.

**NORFOLK & WESTERN RAILWAY COMPANY, a corporation, Defendant.**

**Civ. A. No. 1095.**

United States District Court,
S. D. West Virginia,
Bluefield Division.

March 24, 1970.

W. A. Thornhill, III, (Thornhill, Kennedy & Vaughan), Beckley, W. Va., for plaintiff.

Joseph M. Sanders, (Sanders & Blue), Bluefield, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action by a railroad employee against his employer, brought under the provisions of 49 U.S.C.A. § 5(2)(f) of the Interstate Commerce Act.

The factual background that gives rise to the action is mainly undisputed. Plaintiff is a railroad clerk and had been employed in this capacity for some years by the Virginian Railway Company, at its operations located at Elmore, West Virginia. He is presently employed in the same position and at the same location with the defendant. In the spring of 1959, the Virginian Railway Company and the Norfolk & Western Railway Company made a joint application to the Interstate Commerce Commission for permission to merge their operations.[1]

---

1. The merger of the Norfolk & Western and the Virginian was authorized by the Interstate Commerce Commission in October 1959, upon the Commission's finding that their coordination would result in substantial economies in operation and would be consistent with the public interest. Both railroads were classed as "strong" railroads with the lines of the Norfolk & Western (2,138 miles of road) and the Virginian (608 miles of road) considered to be both complementary and duplicating. In their joint application submitted to the Commission in April of 1959, the railroads described their proposed merger from an operating, as well as a traffic point of view, as a "natural." It is apparent that this conclusion was based on the fact that the two roads served different areas in the coalfields of West Virginia and thereby would complement each other. East of these coalfields, however, the applicants' lines were roughly parallel for almost 350 miles, thus offering promising opportunities to eliminate duplicate and unnecessary facilities by using portions of each line and combining the yards, shop facilities and headquarters. Annual savings were estimated at $12 million. Another reason given by the applicant railroads in support of the merger was that it would afford more stabilized employment on both roads. Furthermore, the railroads contended that the merger would have little, if any, effect on the working forces of the two roads. There was no opposition to the merger. Initial opposition that had been lodged by the employees was withdrawn after labor and management agreed on the terms set forth in the employees protection agreement. On the contrary, there was considerable public support for the merger. (Appendix Volume III to the Report of the Presidential Railroad Commission, Superintendent of Documents, U. S. Government Printing Office, Washington, D. C., February 1962, pp. 167–68). (Plaintiff's Exhibit 12).

In order to comply with the statutory requirement under which this action is maintained, the railroads and the Railway Labor Executive Association entered into an agreement, dated June 18, 1959 (Plaintiff's Exhibit 1), entitled "Agreement for Protection of Employees as Result of Merger of Norfolk & Western Railway Company and the Virginian Railway Company." Plaintiff, being a member in good standing (both at the time of the agreement and presently) of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, is a third-party beneficiary of this agreement. The principals to the contract, after reciting the statute,[2] then mutually agreed as follows:

"1. The provisions of the Washington Job Protection Agreement of 1936, a copy of which is attached hereto, will be applied for the protection of all employees of both the Norfolk & Western and the Virginian who may be adversely affected with respect to their rates of pay, rules, or working conditions, or rights or privileges pertaining thereto upon approval and effectuation of the said merger and related transactions; *provided, however*, that in addition to the benefits provided by the said Washington Job Protection Agreement, it is further agreed as follows:

"(a) On the effective date of the said merger, the Norfolk & Western will take into its employment all employees of the Virginian who are will-ing to accept such employment, and none of the present employees of either of said carriers shall be deprived of employment or placed in a worse position with respect to compensation at any time during his employment because of the merger of said railroads or any program of economies undertaken by the Norfolk & Western because of the merger * * *."

\*　\*　\*　\*　\*　\*

"(d) Section 13 of the Washington Job Protection agreement is deleted and the following provision inserted in lieu thereof:

"In the event any dispute or controversy arises with respect to the protection afforded by this agreement or by the Washington Job Protection Agreement (except as defined in Section 11 thereof) or in connection with any agreement entered into between the carrier parties hereto and the representatives of their employees relating to the said merger and related transactions as provided by the Washington Job Protection Agreement, including an interpretation, application, or enforcement of any of the provisions of said agreements, which cannot be settled by the carrier or carriers and the employee or his authorized representative within 30 days after the dispute arises, it *may* be referred by either party to an arbitration committee for consideration and determination. Upon notice in writing served by one party on the other of intent by that party to refer the dispute or con-

---

2. 49 U.S.C.A. § 5(2) (f), in pertinent part, provides:

"(f) As a condition of its approval, * * * of any transaction involving a carrier or carriers by railroad * * *, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected *by such order being in a worse position with respect to their employment*, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Nowithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

troversy to an arbitration committee, each party shall, within 10 days, select one member of the arbitration committee and the two members thus chosen shall select a third member who shall serve as chairman. Should the two members be unable to agree upon the appointment of the third member within 10 days, either party may request the National Mediation Board to appoint the third member. The decision of the majority of the arbitration committee shall be final and conclusive. The salaries and expenses of the third member shall be borne equally by the parties to the proceeding and all other expenses shall be paid by the party incurring them." (Emphasis supplied).

Subsequent to this job protection agreement, the Interstate Commerce Commission approved the proposed merger and the merger became effective December 1, 1959. As noted above, plaintiff had been an employee of the Virginian for some years prior to the effective date of the merger and following that date, he elected to become an employee of the Norfolk & Western.

In its answer the defendant admitted that as a result of the merger and during a portion of the period from December 1, 1959 to February 28, 1965, plaintiff had been placed in a worse position with respect to compensation and that his compensation had been adversely affected. Plaintiff had made a complaint to his local chairman who proceeded to forward the complaint to the general chairman of plaintiff's Brotherhood. The general chairman filed a claim on plaintiff's behalf against the defendant. The general chairman conferred with defendant and they agreed that plaintiff's claim would be settled on the following basis: Since, during the 12-month period immediately preceding the merger, plaintiff earned an average of $448.78 per month, for the purpose of adversely affected pay adjustments to be made then and in the future this figure of $448.78 would be considered plaintiff's "average monthly compensation," and defendant would pay to plaintiff an amount representing the difference between what plaintiff earned in each month and his "average monthly compensation" and that such payments would be made so long as such difference existed.

Following the settlement of his claim, plaintiff wrote his general chairman, the Grand President of his union, and defendant, complaining about the settlement and contending that his "average monthly compensation" of $448.78 should be increased by the percentage of general wage increases granted by defendant subsequent to December 1, 1959, and that his adversely affected pay should be computed on this additional basis.

Thereafter, defendant paid plaintiff the entire amount of plaintiff's adversely affected pay, according to the agreement entered into by the plaintiff's general chairman and defendant, and plaintiff accepted such payment. If defendant's theory of the case is correct, then defendant is not indebted to the plaintiff in any amount whatever. However, if the plaintiff's theory of the case is correct, defendant was indebted to the plaintiff as of June 1969 in the sum of $3,054.09.

Guy H. Gilmer, Jr., defendant's Manager of Labor Relations, testified that the Merger Agreement had no specific provisions indicating "how matters of this nature would be settled," but that the Washington Job Agreement was a part of the Merger Agreement, and the Washington Job Agreement established a test period for computing an employee's adversely affected pay, and that the Washington Job Agreement was followed in the settlement of plaintiff's claim for adversely affected pay.

Besides a general denial of plaintiff's complaint, the defendant sets up in its answer certain affirmative defenses to the action. One of these is that this Court should dismiss the action because the plaintiff has not exhausted his remedies under the contract he sues upon, i. e., he has not submitted or attempted to submit his claim to the arbitration

procedure provided for in the Merger Agreement (Plaintiff's Exhibit 1). We perceive our immediate task to be one of resolution of this assertion, for if we find that plaintiff is obligated to pursue contractual and administrative procedures to the ultimate degree, then his suit here is premature and the other questions he raised are mooted.

■ As a general rule, parties to an arbitration are those that have become so by virtue of a contract to arbitrate, and it necessarily follows that the submission of a controversy to decision by arbitration is, perforce, the agreement of the parties to arbitrate. At common law there was no *right* of arbitration, notwithstanding a prior agreement. Therefore, as a general rule, if a dispute is to be submitted for arbitration as a matter of right, it must be under a statute. 5 Am.Jur.2d, Arbitration and Award, Section 2, p. 519. Although at common law an agreement for arbitration may have created substantial rights, common law arbitration is a part of the law of remedies. However, this basic concept has been changed by statute and by this change arbitration has become a part of the substantive as well as the remedial law. 5 Am.Jur.2d, supra. Since the enactment of the arbitration statutes the trend established by the courts is one of favoring arbitration as a shortcut to substantial justice. 5 Am. Jur.2d, Arbitration and Award, Section 5, p. 522; John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). It has been held that arbitration is a substitute for proceedings in court and public policy favors arbitration settlement with a minimum of court interference. McRae v. Superior Court of Los Angeles County, 221 Cal.App.2d 166, 34 Cal.Rptr. 346, 98 A. L.R.2d 1239 (1963).

■ We can find no better statement of policy than that expressed by the United States Supreme Court in the *Livingston* case, supra,

"The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations compellingly so demanded."

There are no circumstances presented by this record requiring a disregard of this announced policy. Moreover, the Supreme Court has long recognized the importance of arbitration under collective bargaining agreements by characterizing arbitration as part and parcel of the collective bargaining process itself. United Steelworkers of America v. Warrior & Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Therefore, with these guidelines in mind, we look to the pertinent part of the Railway Labor Act, 45 U.S.C.A. § 153, first (i), which provides:

"(i) The *disputes between an employee* or group of employees *and a carrier* or carriers *growing out of grievances or out of the interpretation or application of agreements concerning rates of pay*, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes *may* be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." (Emphasis added).

In Batts v. Louisville and Nashville Railroad Company, 316 F.2d 22 (6th Cir. 1963), a case that dealt with a railroad merger and with disputes of adversely affected employees, it was held that where the Interstate Commerce Commission had ordered arbitration committees to be set up and the language used in the order was that disputes "may be referred" to the said committees, that such arbitration was not permissive but mandatory. The rationale of the holding is found at 316 F.2d at p. 27,

"There appears to us nothing unfair or inequitable *about requiring a railway employee* to submit his individual claim to an arbitration board, the formation of which is agreed upon by the duly certified bargaining agent of the employees and the carrier."

And in Republic Steel Corporation v. Maddox, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 3 L.Ed.2d 580 (1965), it was stated:

"As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances *must attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress." (Emphasis supplied).

The facts in the case at bar reveal that the plaintiff chose to follow the grievance procedure outlined in the Merger Agreement only to a slight degree, namely, to the point where his authorized representative and the railroad "settled" his claim. He made no attempt to *exhaust* the contract grievance procedure.

In a series of cases that have involved the construction of 45 U.S.C.A. § 153, first (i), it has become firmly established that it is the ordinary rule that administrative remedies should be exhausted before resort to the courts. Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (February 24, 1970); Glover v. St. Louis-S. F. R. Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Moreover, we are of the opinion that where a collective bargaining agreement is negotiated between equal parties and a grievance procedure is provided, then the meaning of "may be submitted to arbitration" is correctly interpreted by the Eighth Circuit in Bonnot v. Congress of Independent Unions, Local #14, 331 F.2d 355, 359 (9 Cir., 1964), to mean:

"The obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim."

Other cases in support of the proposition that the word "may" means "must" in the context of the statute under consideration include the following: United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Rhine v. Union Carbide Corporation, 343 F.2d 12 (6th Cir. 1965); Payne v. Pullman Company (1957), 13 Ill.App.2d 105, 141 N.E. 2d 83.

Plaintiff relies heavily upon the case of Moore v. Illinois Central R. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941), however, we find that the position he takes in reliance upon this case to be untenable. The *Moore* case dealt with the law of Mississippi and the law of that state gave a cause of action to the plaintiff in that case. Counsel for the plaintiff has conceded that federal law alone governs the case before us.

Therefore, finding as we do that the action must be dismissed for failure of the plaintiff to exhaust remedies available to him under the contract to which he is a beneficiary and that such failure precludes him from relief in this action, we do not reach the other issues in the case.